410 So.2d 896 (1981)
Ex parte Matthew Alen SHUTTLEWORTH and Deborah Ann Shuttleworth. (Re In the Matter of Mary Ann (Matthews) KELLEY, Matthew Alan Shuttleworth, Father, and Deborah Ann Kelley, Mother v. LICENSED FOSTER PARENTS, et al.).
80-311.
Supreme Court of Alabama.
October 2, 1981.
Rehearing Denied February 5, 1982.
Joel E. Dillard of Baxley, Stuart, Ward & Dillard, Birmingham, for petitioners.
*897 Susan M. Tuggle of The Legal Clinic of Foley, Rodenhauser & Tuggle, Huntsville, for respondents.
PER CURIAM.
This is a case involving termination of parental rights by the Family Court of Jefferson County, Alabama.
We granted a petition for writ of certiorari to the Court of Civil Appeals to review the propriety of its affirmance of the judgment of the Family Court of Jefferson County, denying relief on a Rule 60(b), A.R. C.P., motion to the natural parents of an illegitimate child. 410 So.2d 894. The poignant plea of these young parents for custody of their first-born child deserved and received careful and considerate attention by two of our courts. Nevertheless, they have not met with success. Because of a threshold procedural error, which may have substantially undercut the substantive issues involved in the case, we are constrained to reverse.
In order to place the issues in proper focus, we provide a brief statement of the facts. The petitioners Deborah Ann Shuttleworth (Deborah) and Matthew Alen Shuttleworth[1] (Matthew) are 21 years of age. A baby girl, Mary Ann Kelley (Mary Ann), was born to them on January 1, 1980, in the State of Tennessee. Deborah and Matthew were, and are, students at Calhoun Community College, are in love, and have, since the birth of their child, married. Matthew never denied paternity of the child and has relentlessly objected to adoption and objected to abortion. Deborah admits he is the father of the child. From the first time he learned that Deborah was pregnant, he wanted to marry her and become the legal father of the child. On the other hand, Deborah vascillated. She was ill during the pregnancy with preeclampsia, a physical disorder caused by a toxic condition developed in late pregnancy.
In her confusion and illness, she consulted with Laura Dinwitty (Ms. Dinwitty) of the Catholic Social Services Agency of Huntsville, Alabama, about placing the child for adoption. She testified that she told Ms. Dinwitty that Matthew was opposed to adoption and would not consent thereto. In spite of this, Ms. Dinwitty wrote the court that, "Mr. Shuttleworth, age 21, is willing to sign the necessary papers and chooses to sign them stating that he neither denies nor admits paternity. He would like the papers mailed to him at his address, 211 Mark Street, Decatur, Alabama 35601."
On another occasion in a "court summary" she wrote "He [Matthew Shuttleworth] was contacted regarding the birth of Mary Ann Matthews and agreed to adoption placement. His present address is 211 Mark Street, Decatur, Alabama 35601."
At the time Ms. Dinwitty authored these statements, she had never met Matthew. These statements were before the court for its consideration on March 25, 1980, when the parental rights of Matthew to his then three-month-old daughter were terminated. Doubtless, they entered into the decision making process and may have substantially influenced the court to order the following:
It having been made to appear to the Court that the putative father, Matthew Alan Shuttleworth, does have knowledge of this hearing, has discussed the case with the social worker with the Catholic Social Services indicating his consent, and having failed to appear, and
The Court having considered and understood the same, is of the opinion that it would be in the best interests of the future welfare of said child that the putative father be relieved of its custody, all interested parties in open court having expressed consent and agreement to the order herein made, it is, accordingly,
ORDERED, ADJUDGED AND DECREED BY THE court that all parental rights which the putative father, Matthew Alan Shuttleworth has in or to the care and custody of said infant, Mary *898 Ann Matthews, be and they are hereby terminated and severed, and the care, custody and control of said child is hereby committed to the Catholic Social Services for permanent placement or adoption.
By her own statement, Ms. Dinwitty admits that she saw Matthew for the first time on May 21, 1980, almost two months after his parental rights were terminated. She said that she made the representation to the court concerning agreement of the father because the mother had said on one occasion that he would agree, although on other occasions she had said he would not agree.
Deborah testified in court that Ms. Dinwitty told her she had twelve months after the court hearing to make up her mind as to whether or not the surrender of her child would be permanent. Ms. Dinwitty denies making such a representation. She does not deny that she attempted to notarize a consent paper purportedly signed by Matthew Alen Shuttleworth, although she had not seen him sign it. Her jurat on this particular paper was cancelled almost immediately by her, after considering the impropriety of making such a certification. This document was not presented to the court at the hearing on March 25, because it was not received until after the hearing was completed.
Ms. Dinwitty admitted that if she had handled the custody proceedings in Madison County, Alabama, she would have written the father and had direct communication from him before final hearing in Family Court. The proceedings were held in Jefferson County at the request of Deborah in order to protect the secrecy of her giving birth to an illegitimate child. In furtherance of the same purpose, the child was born in Tennessee. Similarly, Matthew says he signed the consent because he was told by Deborah that it was necessary to protect the secrecy of the birth, but not to surrender his parental rights.
Although Matthew, along with his wife, is a student at Calhoun Community College, he is a licensed cosmetologist and works as such 40 hours per week. Matthew's parents, as well as Deborah's parents, have been supportive of them throughout their crisis. Harold Kelley, the father of Deborah, is employed with the Tennessee Valley Nuclear Division and earns an income in the $30,000.00 to $40,000.00 bracket. He has offered to his daughter and her husband anything that they might need in the way of financial or moral support for the help of the baby. Likewise, H. W. Shuttleworth, the father of Matthew Shuttleworth, is an instructor, basketball coach, and athletic director at Calhoun Community College. He earns approximately $25,000.00 a year and has also agreed to help support his son's child. Both of their spouses have offered to give any help needed.
It is uncontroverted that Matthew did not sign for the process notifying him of the termination hearing, as required under Rule 4.1(c)(2), A.R.C.P. The father of Matthew signed as agent for Matthew, but, in fact, was not his agent. After signing the papers from the Family Court, the father put the process in his son's room, where Matthew received it. Later, Matthew took the papers to Deborah who told him they were papers from the court which he should sign in order to protect the secrecy of the birth. Matthew testified that he thought that in any proceeding designed to terminate his rights, he would receive papers from the sheriff's office by way of a knock on his door and personal delivery. He said [he had planned] that when he got those papers he would get a lawyer and fight the case. After learning that his parental rights had been terminated, on June 10, 1980, Matthew, along with Deborah, filed a motion under Rule 60(b), A.R.C.P., to set aside the court's order of March 25, 1980. The motion sought to join the adoptive parents, who at the time of the filing of the motion had had custody of Mary Ann for only two months. They were not joined, however. On July 21, 1980, the court heard testimony on the motion and continued it to August 4 for additional testimony. The court, on August 14, 1980, entered a fourpage order denying relief under the Rule 60(b) motion. The court concluded:

*899 It is obvious that the proposed adoptive parents have acted in good faith and have taken the child in their home to be adopted. The Court is well aware that regardless of its decision there will be much sadness concerning the placement of this child. The court is of the opinion that if such sadness must exist, the ones who allowed it to come into existence must be the ones to shoulder the burden.
At the outset, we must determine if Matthew was properly notified of the hearing set to determine if his parental rights in and to Mary Ann should be terminated. If he was not properly notified, then the Family Court of Jefferson County had no authority to terminate his rights. The Legal Clinic urges us not to disturb the judgment of the Family Court of Jefferson County, because Matthew Shuttleworth did receive notice of the March 25th hearing, albeit not in the exact form prescribed by Rule 4.1(c)(2), A.R.C.P. All that was lacking was his signature on the return receipt, and that this formality does not violate the due process requirements of the United States Constitution. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). They go on further to say that an unwed father is not entitled to notice in a hearing to terminate parental rights, although in delinquency cases he is entitled to notice and even the appointment of counsel if he is indigent. Smoke v. State Department of Pensions and Security, 378 So.2d 1149 (Ala.Civ.App.1979); Crews v. Houston County Department of Pensions and Security, 358 So.2d 451 (Ala. Civ.App.1978); cert. denied, 358 So.2d 456 (Ala.1978).
In the seminal decision of In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), the Supreme Court of the United States declared that in delinquency hearings due process requires that adequate written notice, at the earliest practicable time, be afforded to the child and his parents or guardian, informing them of the specific issues they must meet to allow them to prepare a defense. The court further held that in such delinquency proceedings the child and his parents must be advised of their right to be represented by counsel and that if they are not able to afford same, counsel should be appointed to represent them. Following that decision, legislatures of various states provided for such notice and counsel in delinquency cases. Such due process safeguards in Alabama are found in Code 1975, § 12-15-63. We can perceive no reason to guarantee these due process safeguards in a delinquency case and refuse them in a case terminating parental rights. In the former, the child is subject to severe punishment by incarceration or otherwise. In the latter, the natural bonds of family are subject to destruction. The judicial action in both instances portends grave consequences, indeed. Our courts, to their credit, have perceived no distinction. The very case cited by the Legal Clinic, Smoke, is a termination of parental rights case, pure and simple, with no attendant delinquency procedures. The child in Smoke also was an illegitimate child.
Over 58 years ago, this court, in the case of Lewis v. Crowell, 210 Ala. 199, 200, 97 So. 691, 692 (1923), held that the father of bastard children was entitled to their custody. The court said:
The putative father of bastards, desiring the custody and control of them, is entitled to it against all but the mother, if competent to care for and suitable to take charge of them; and if it appears from the evidence that the best interest and welfare of the children will be thereby secured.
The critical question, however, is whether such a parent is entitled to notice prior to the revocation of any parental rights which he might have? In the leading case of Sinquefield v. Valentine, 159 Miss. 144, 132 So. 81 (1931), Annot., 76 A.L.R. 238 (1932), it was held that a parent of legitimate children cannot be deprived of their custody without a hearing before a court of competent jurisdiction in which he has been properly served with process, has entered an appearance, and has been allowed an opportunity to appear and be heard. The same *900 procedural safeguards now have been provided for the parents of illegitimate children by the United States Supreme Court decision in Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). There, the Illinois law provided that children of all parents could be removed from them in a neglect proceeding that entailed notice, hearing, and proof of parental unfitness. An unwed father, however, was subject to loss of his children absent a showing of unfitness. He was not entitled to notice or hearing. The Illinois dependency law did not recognize such a parent's interest in his illegitimate children. Upon their mother's death, such children became wards of the state. The United States Supreme Court held that the unwed father's 14th amendment due process and equal protection rights were violated.
Having determined that an unwed father is entitled to proper notice and a hearing in proceedings to terminate parental rights, we now must determine whether or not such notice was afforded Matthew in the instant case. Rule 13, Alabama Rules of Juvenile Procedure, provides that: "service of summons shall be pursuant to the Alabama Rules of Civil Procedure except as hereinafter provided." Service was attempted on Matthew Shuttleworth under Rule 4.1(c)(2). That section reads as follows:

How Served. The clerk in that event shall place a copy of the process and complaint or other document to be served in an envelope and shall address the envelope to the person to be served with instructions to forward. He shall affix adequate postage, and place the sealed envelope in the United States mail as certified mail with instructions to forward, return receipt requested, with instructions to the delivering postal employee to show to whom delivered, date of delivery and address where delivered. When the person to be served is a natural person, the clerk shall also request restricted delivery, unless otherwise ordered by the court. The clerk shall forthwith enter the fact of mailing on the docket sheet of the action and make a similar entry when the return receipt is received by him.
The Committee's comment on Rule 4.1(c) provides that:
When the person to be served is a natural person, the clerk must require "restricted delivery" since this method of delivery has superseded the earlier provision for "deliver to addressee only." See Postal Bulletin 21023, February 13, 1975. Under the Regulation, this type of delivery is defined as follows:
Restricted Delivery provides a means by which a mailer may direct that delivery be made only to the addressee or to an agent of the addressee who has been specifically authorized in writing by the addressee to receive his mail. This service is available only for articles addressed to natural persons specified by name...." Postal Service Manual, Sec. 165.31, February 7, 1975.
Clearly, the provisions of Rule 4.1(c)(2) were not complied with. The summons was not delivered to Matthew. He did not sign for it, and did not authorize his father as agent to receive it. Rule 4.1(c)(2), A.R.C.P., introduced a new concept allowing service within the state by certified mail. We require strict compliance therewith. Matthew was under the impression he would be served in the old way by the sheriff or his deputy knocking on his door. The least he should be entitled to is that the innovative change would be strictly complied with.
In O'Donohue v. Citizens Bank, 350 So.2d 1049 (Ala.Civ.App.1977), the Court of Civil Appeals had the occasion to construe the twin of Rule 4.1(c)(2), A.R.C.P.Rule 4.1(b)(2). Rule 4.1(b)(2) provides:
As an alternative to delivery by the sheriff, process issuing from any court governed by these rules may be delivered by the clerk to any person not less than eighteen years of age, who is not a party and who has been designated by order of the court to make service of process.

In the O'Donohue case, service of summons was made by the plaintiff's lawyer, *901 although he had not been designated by order of the court to make such service. On a motion to quash service because of this defect, the court then appointed plaintiff's attorney, thereby purportedly ratifying the attorney's previously illegal action. The Court of Civil Appeals held Rule 4.1(b)(2), A.R.C.P., must be strictly complied with and reversed and remanded the case. We agree its decision in O'Donohue was proper, and it is in accordance with our resolution of the service problem in this case. Likewise, Rule 4.1(c)(2) must be strictly complied with. Having said all of this, we could stop here, reverse and remand the case, and leave dangling a very emotionally sensitive issue, as well as the future hopes and aspirations of several individuals, including a 21-month old infant.
It now has been one year since the Family Court overruled Matthew and Deborah's Rule 60(b) motion. Compared with other judicial systems, our courts can be complimented for their efficiency in processing actions. However, from the point of view of the interested parties the time must have seemed interminable. It appears from the record that the Family Court, in entertaining the Rule 60(b) motion, in effect, held a second, but more protracted custody hearing. Although Matthew and Deborah had requested the foster parents' presence at the hearing, the court declined to join them. There is no testimony whatsoever as to the fitness of the foster parents to have custody of Mary Ann. On the other hand, there is abundant testimony as to the fitness of the petitioners, buttressed with the support of their very fine parents and their financial incomes.
The best interest of the child is the fundamental concern of the court in every child custody case. However, where there are conflicting claims between parents and nonparents and the parents are deemed by the court to be fit and proper persons, the primary right to custody is with the parents. Chandler v. Whatley, 238 Ala. 206, 189 So. 751 (1939); Pendergrass v. Watkins, 383 So.2d 851 (Ala.Civ.App.1980). This court also has said that "the right of a parent, the mother or the father, to the custody and control of a child must not be concluded by one unbecoming or immoral act." Whitten v. Whitten, 214 Ala. 653, 654, 108 So. 751 (1926). The right of natural parents to have the custody of their offspring comports with the natural tendencies of our society. This in no way is meant to disparage the love and affection that non-natural parents have given to their adopted children. The family unit is the basic foundation of our society. There are forces at work which attempt to tear it asunder. It is the duty of the courts to forge chains that will bind that unit together. Although Deborah, in her illness and confusion, sought to give away her child (she thought temporarily), she now sees, as Matthew has always seen, it is their duty to love, care for, and bring up their child and hopefully other children in a manner which will make them decent and respected citizens of this state and nation. Her mistake may have been due to over reliance on Ms. Dinwitty or misunderstanding her. The court, likewise, may have been led astray by representations and statements made by Ms. Dinwitty, whether made with improper purpose or innocently. Out of the fires of adversity, strong personalities are molded. Their willingness to push forward in this litigation is indicative that they have developed the trait of perseverence.
However, we are unwilling to adjust the delicate balancing of these principles as they mesh in the factual situation that may exist with the persons involved at the present time. The trial court is peculiarly suited to perform this task. For these reasons, the judgment of the Court of Civil Appeals is due to be reversed and the cause is remanded to the Court of Civil Appeals with directions to reverse the judgment of the Family Court of Jefferson County and require it to hold a hearing to determine the parental rights of the petitioners in the light of the principles set forth in this opinion. The Family Court is also to determine if there has been a valid waiver of rights made by the petitioners.
REVERSED AND REMANDED WITH DIRECTIONS.
*902 FAULKNER, JONES, ALMON, SHORES, EMBRY, BEATTY and ADAMS, JJ., concur.
TORBERT, C. J., concurs in the result.
MADDOX, J., not sitting.

ON APPLICATION FOR REHEARING
TORBERT, Chief Justice (concurring in the result and in the denial of rehearing).
I concur in the decision of the Court to remand this case for a determination by the trial court of whether the natural father knowingly consented to the adoption of the child, or otherwise waived his right to object. I believe that this is the sole question to be dealt with by the trial court. While the agencies involved may be called upon to defend their actions, I believe that the adoptive parents must remain anonymous.
NOTES
[1] The petition for certiorari was filed in this court under the name Matthew Alen Shuttleworth, although the case in the Court of Civil Appeals was styled Matthew Alan Shuttleworth.