This case began March 11, 1980, by the filing of a petition to terminate the parental rights of Deborah Ann Kelley and Matthew Shuttleworth to a child born out of wedlock on January 1, 1980. The petition was filed by Catholic Family Services, which organization had been given custody of the child at birth by her mother. By judgments on March 11 and March 25, 1980, the rights of the parents were terminated and custody of the child, with permission to place for adoption, was granted to Catholic Family Services.
On June 10, 1980, a Rule 60 (b) motion was filed on behalf of the parents, who were then married, seeking to set aside the orders of March 11 and 25. After lengthy evidentiary hearing, the court entered a judgment on August 14, 1980, with extensive finding of fact, denying the 60 (b) motion. Appeal of that judgment was brought to this court. We affirmed the judgment of the trial court by decision entered December 12, 1980, Kelleyv. Licensed Foster Parents, 410 So.2d 894 (Ala.Civ.App. 1980). Our judgment was reversed by the Supreme Court of Alabama on October 2, 1981. Ex parte Shuttleworth, 410 So.2d 896 (Ala. 1981). Application for rehearing was denied by that court. An order of remand with directions was issued by this court,410 So.2d 902, on February 24, 1982, to the trial court.
The remandment directions transmitted through this court to the trial court were contained in the last two sentences of the opinion. Id. at 901. Earlier in the opinion, the court determined that the order of the trial court terminating the father's parental rights should have been set aside upon hearing of the 60 (b) motion because notice of the hearing for termination was not served in strict compliance with Rule 4.1 (c)(2). Thereafter, the court noted that in hearing the 60 (b) motion, the trial court held a "protracted custody hearing." The hearing was held without the presence of the adoptive parents. The supreme court set out the principles controlling claims of custody between natural parents and foster parents. The court then stated that the issue of custody was best determined by the trial court and further said as follows: *Page 1294 
 "For these reasons the judgment of the Court of Civil Appeals is due to be reversed and the cause is remanded to the Court of Civil Appeals with directions to reverse the judgment of the Family Court of Jefferson County and require it to hold a hearing to determine the parental rights of the petitioners in the light of the principles set forth in this opinion. The family court is also to determine if there has been a valid waiver of rights made by the petitioners.
"Reversed and Remanded with Directions."
Upon application for rehearing, the chief justice (concurring in the result and denial of rehearing) added comment that the sole issue that should be considered by the trial court on remand was "whether the natural father knowingly consented to the adoption of the child or otherwise waived his right to object." He further commented that the adoptive parents should remain anonymous.
Upon remand, motions were filed by Catholic Services for protection of the adoptive parents. Motions for discovery were filed by the natural parents. All motions were heard by the court on March 19, 1982. The trial court took all under advisement and sought from the supreme court clarification of its opinion of October 2, 1981. There was denial of clarification. The trial judge granted a motion of the natural parents to recuse and removed himself from the case.
In August 1982, the new trial judge denied Catholic Services' motion to protect the identity of the adoptive parents. Catholic brought a petition for mandamus to this court. We granted the writ of mandamus. The effect was to preserve the anonymity of the adoptive parents until the issue of consent or waiver for the adoption by the father was determined by the trial court.
Petition for writ of mandamus to be directed to this court was granted with opinion on August 16, 1982. Ex parte Nice,429 So.2d 265 (Ala. 1982). The supreme court reiterated much of its opinion of October 1981 and held that the trial court had broad discretion in permitting discovery to Shuttleworth. The court stated that discovery of any information in the possession of Catholic Services "which might bear on the issue of whether the father waived his parental rights" was permissible. The court also said that whether the identity of the proposed adoptive parents would be disclosed was a matter within the discretion of the trial court. However, it said that ordinarily the identity of proposed adoptive parents is not discoverable in a proceeding to rescind an adoption or to set aside an order terminating parental rights.
The chief justice entered a dissent joined by Justice Faulkner. The dissent pointed out that the area of disagreement with the majority was in the disclosure of the identity of the adoptive parents. It said the only issue to be heard was the validity, vel non, of the adoption proceedings. If the adoption was not valid, the natural parents were entitled to custody. If the adoption was valid, the adoptive parents were entitled to custody. Thus the need to learn the identity of the adoptive parents so that relative fitness could be determined, was unnecessary in either case.
This court, in compliance with the directive of the supreme court, set aside its writ of mandamus. The trial court on October 20, 1982, set a hearing for December 6, 1982, upon the issue of consent and waiver of service of the adoption proceedings. Intervention of counsel for the adoptive parents was permitted on November 3, 1982.
The trial court heard testimony of ten witnesses on December 6 and 9, 1982, with arguments and written briefs. On January 12, 1983, the court entered a lengthy judgment including statement of evidence and finding of fact. The conclusion was that Matthew Shuttleworth had waived all parental rights to object to the adoption of the child, Mary Ann Kelley. Shuttleworth appeals.
The preceding lengthy recital of the court history of this case is felt necessary for full understanding. To this court, the bottom *Page 1295 
line of the history is that the present and future welfare of a child has been in limbo since its birth on January 1, 1980.
The primary issue presented by this, the third proceeding brought to us in this matter, is: did the court err upon remand in finding that Matthew Shuttleworth knowingly consented to the adoption of Mary Ann Kelley or that he waived his right to object?
In beginning our discussion, it must be recalled that the supreme court in its decision of October 12, 1981, Ex parteShuttleworth, 410 So.2d 896 (Ala. 1981), reversed this court's affirmance of the denial of a 60 (b) motion by the trial court. That motion alleged fraud, undue influence and misrepresentation by Catholic Services upon the mother to secure her relinquishment of parental rights, and consent to adoption of her child. The motion also charged improper service of notice of hearing to terminate parental rights of the father. This court held that the trial court did not abuse its discretion in denying the Rule 60 (b) motion on either ground.
The supreme court granted certiorari and held that we had erred in finding that valid service of notice was had upon the father. Having found service of notice of termination of parental rights legally insufficient, the court said as follows:
 "Having said all of this, we could stop here, reverse and remand the case, and leave dangling a very emotionally sensitive issue, as well as the future hopes and aspirations of several individuals, including a 21 month old infant."
The court then observed that the trial court, while entertaining the 60 (b) motion, had, in effect, held a protracted custody hearing, though without the presence of the adoptive parents. It followed that observation with favorable comments about the natural parents and stated principles to be applied in custody claims between parents and nonparents. The supreme court concluded its opinion by stating that it was going to remand to the trial court for the "delicate balancing of these principles. . . ." The remand directions were then given as we previously quoted herein.
It is the best understanding of this court from these pronouncements of the supreme court that it considered that the hearing on the 60 (b) motion expanded into a hearing to determine custody of Mary Ann Kelley as between the natural and adoptive parents. It determined that setting aside the termination of parental rights of the father for failure of legal service did not conclude the "sensitive issue" of custody.
In its opinion in Ex parte Nice, supra, the court, referring to its opinion in Shuttleworth stated:
 "The third issue addressed but not decided was whether the unwed father had knowingly consented to adoption and whether the parents of the child had otherwise waived their rights to the child. We directed the Court of Civil Appeals to remand the cause to the family court of Jefferson County for a determination of this issue."
This clarification, followed by discussion and quotations from the case of Williams v. Pope, 281 Ala. 416, 203 So.2d 271
(1967), must have caused the trial court to limit the hearing on remand to the issue of consent or waiver of right by the natural parents to object to the adoption of their child. It is our opinion that such was the proper issue.
Though the mother is now claiming to have been misled and confused by the representations of the social worker for Catholic Services, Mrs. Dinwiddie, there is more than sufficient evidence to conclude the contrary. She first sought an abortion, traveling with her parents and Shuttleworth to Atlanta for that purpose. Upon being informed that an abortion was not medically advised, she sought the aid of Catholic Services in giving birth at a place away from her hometown. She allowed her child to be taken from the hospital and placed in a foster home. She signed a petition and consent for termination of her parental rights and those of the father, and she appeared in court when the judgment of termination of her parental rights was entered. The court proceedings were *Page 1296 
instituted away from her home county at her direction. She served as intermediary and informant between Catholic Services and Shuttleworth, keeping him informed of each event and step toward adoption of their child. She contrived, consented to, and participated in every aspect of the proceeding. She therefore may not change her mind and undo what she has done.Williams v. Pope, supra.
The father, Shuttleworth, though not physically participating as fully as the mother, was kept fully informed of everything she was doing. He was present on the trip to Atlanta to secure an abortion. He was present at the birth of the child in Tennessee. He was informed of the role of Catholic Services in that birth and the removal of the child from the hospital. He never saw his child nor contributed to the expense of her birth. He knew that the mother had agreed to her adoption long before she was born on January 1, 1980. He was informed by the mother of the termination of her rights and her consent thereto on March 11, 1980. He admitted to being informed that there was scheduled another hearing for March 25, 1980, of which he was to receive notice, to terminate his parental rights. He acknowledged that he did receive the registered letter advising him of the hearing and containing consent and waiver form, albeit the letter was not served procedurally according to statute. He acknowledged that he subsequently signed the form contained in the letter at the request of the mother and gave it to her to return to Mrs. Dinwiddie for filing. The court found that Shuttleworth had the letter at least ten days prior to the hearing on March 25. He denies opening the letter and examining its contents though he gave it to the mother and discussed with her its contents and the form for waiver of notice and consent. He admits failing to keep an appointment with Dinwiddie set for the morning of March 25. The court was at liberty to disbelieve his denial of opening and examining an official letter from the court when he knew of its purpose. In fact, the testimony of Shuttleworth and the mother pertaining to misrepresentation and misunderstanding of events leading to the adoption is subject to disbelief.
There has been considerable reference to the signing of a jurat to Shuttleworth's signature on the form by Mrs. Dinwiddie as a notary public. That jurat was removed by Mrs. Dinwiddie because she had not actually performed it. Concern about the jurat has little importance — first, because we find no statutory requirement that consent for adoption be notarized; second, because the signature of Shuttleworth to the instrument is admitted. The form he signed was an admission of knowledge of the pending proceedings and of their purpose. It contained an acknowledgment of service and waiver of further notice. There was consent to termination of parental rights and to placement for permanent custody and adoption. We recognize that the waiver was apparently signed after the hearing and judgment and was not filed in the court. However, it is evidence and indication of the knowledge and state of mind of Shuttleworth after he knew of the judgment terminating the rights of the mother and the pending hearing as to his parental rights.
For some three months subsequent to the termination of parental rights and the direction by the court to find adoptive parents, the Shuttleworths made no effort to set aside the judgment. When this proceeding was begun the child had been in the custody of Catholic Services for her lifetime of nearly six months. The mother had seen her no more than three times. The father had never seen her. Foster parents had fed her, held her, loved her while the parents proceeded with their lives as though they never had a child, even though they were in daily company and subsequently married. The dark secret of her birth and being remained hidden from their friends. She was exiled in a foreign land — until she found love, care and protective parents who wanted her so badly that they would pay a fee of a thousand dollars to get her. Thereafter, her existence was no longer denied. She came alive in the arms of parents who *Page 1297 
were proud of her. Parents who surely announced to all that they had a daughter and that she had a family.
Our supreme court spoke poignantly of the family unit as the basic foundation of our society and the duty of courts to forge chains that will bind it together in its first opinion in this case (R. 901). We endorse that expression. However, chains of a family unit in this case have been forged between Mary Ann and her adoptive parents. They have been bound together for more than three years. Mary Ann knows no other parents or family. It does not require the wisdom of a King Solomon to decide the real parents of this child nor to recognize the devastating trauma which will strike her if her family unit is broken. A family unit is forged through love and caring, one for the other. It does not arise merely from birth and blood. If that were the test, this case would never have arisen.
In Ex parte Nice, supra, the supreme court said:
 "[A] mere change of mind cannot justify the rescission of a decision to place a child for adoption if the natural parents have given an informed, intelligent consent and all the procedural safeguards have been followed."
It is our opinion that these conditions have been met; that the trial court correctly found as a fact that the mother consented and that the father with knowledge of the acts of the mother and the proceedings before the court, acquiesced therein and by his conduct waived his parental right to object to the adoption of his child. It is further our opinion that in regard for finality of judgment and in consideration of the best interest of Mary Ann, the motion 60 (b) should be denied.
The second issue presented is that the trial court after Exparte Nice, supra, denied discovery of information as to the adoptive parents, but permitted appearance of their attorney in the case. Shuttleworth also complains of the court receiving letters from counsel praising the adoptive parents. In response to this issue we note that the supreme court in Ex parte Nice,supra, expressly left discovery concerning the adoptive parents to the discretion of the trial court after specifically directing that the court's first course was to determine whether the "unwed father had knowingly consented to adoption and whether the parents of the child had otherwise waived their rights to the child." It is our conclusion that the trial court followed the mandate of the supreme court.
The trial judge did not solicit the letters received. He expressly stated he did not consider them and placed them in the court file. The only issue before the court did not involve the consideration of the respective merits of the natural parents and adoptive parents. This court considers that counsel for the adoptive parents properly had an interest in the case (Rule 24, A.R.Civ.P.) if only as amicus curiae. We find no error in allowing him to participate.
AFFIRMED.
BRADLEY and HOLMES, JJ., concur.